Filed 8/26/15  P. v. Martinez CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B255184 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA100294) |
| v. | |
| JIMMY M. MARTINEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Bruce F. Marrs, Judge.  Affirmed.

Richard A. Levy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Michael C. Keller and Russell A. Lehman, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

A jury found defendant and appellant Jimmy M. Martinez (defendant) guilty of murder and attempted murder and found true gun and gang allegations. The main evidence against defendant consisted of his incriminating jailhouse statements to undercover deputies. On appeal, defendant contends that his statements are insufficient to support the judgment and that their admission violated his due process rights. He also argues that the evidence is insufficient to show that the crimes were premeditated and deliberate and to support the true finding on the gang allegation. We reject all contentions and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Factual background.

A. *June 25, 2012: the murder of Guillermo Reyes and attempted murder of Jaime Martinez.*[1]

At approximately 10:40 p.m. on June 25, 2012, Reyes was shot and killed while driving a Honda on Center Street in Baldwin Park. Martinez was with Reyes. Reyes was a North Side Bolen Parque gang member, and Martinez was either a member or an associate of the gang. One of the gang's rivals was Kings Have Arrived (KHA), to which defendant belonged.

Martinez testified at trial that he didn't recall what happened when Reyes was shot. But in an interview with detectives the day after Reyes was shot Martinez said that Reyes was driving when they were "cheap shotted," "like from the back." Martinez grabbed a gun and shot through the Honda's front windshield at the shooter's car, a "white SUV," which was now in front of them or driving off. In addition to the SUV's driver, there was a front seat passenger and a rear right seat passenger, who was the shooter. Martinez couldn't "remember their faces because they had like rags on them." "After that I was just um, like I was laying down. I thought I got shot."

---

[1]     Nothing in the record indicates that Martinez and defendant are related.

Uninjured, Martinez took Reyes to a hospital, where Martinez threw the gun, a semiautomatic, into a planter.[2]  Reyes died from a gunshot to his head.  A .38 bullet was recovered from Reyes's body.  The bullet could have been fired from a .38 special or a .357 magnum.

The driver's side rear passenger window of the Honda (the victim's car) had damage that might have been caused by a bullet entering the car.  The driver's side mirror also had damage suggesting that a bullet was fired at the Honda.

A white SUV with gunshot damage was never found.  No physical evidence or witnesses connected defendant to the crime.

B.     *Defendant's jailhouse statements to undercover deputies.*

Several months after Reyes's murder, defendant was in custody on an unrelated matter.  When detectives received anonymous information about defendant, they conducted, on September 7, 2012, an undercover operation.  Deputy Sheriffs Anthony Castro and Navarro, posing as South Siders (Hispanic gangsters from Southern California), were placed in a holding cell.[3]  One deputy wore a recording device, and there was another recording device in the cell.[4]  Detective Angus Ferguson listened via a live feed in a separate room.  Defendant was put in the cell with the deputies, who told defendant they were in jail for murder.  Defendant introduced himself as Danger from KHA.[5]

---

[2]     In connection with these events, Martinez pleaded no contest to weapons and stolen vehicle charges.

[3]     The cell was approximately 15 by 20 feet, with a toilet, two windows and a door with a window.

[4]     Parts of the approximate three-hour recording were played for the jury.  Large parts of the recording were unintelligible.

[5]     At times, defendant would be removed from the cell and the deputies would be removed at other times.  When the deputies were removed, they would report what defendant had said.

3

After being in the cell for about 32 minutes, defendant was removed for an 18-minute interview with detectives. Detectives told defendant they were investigating the "shoot out" murder of a North Side Bolen gang member named Memo near Center and Palm Streets in Baldwin Park. Although it was untrue, the detectives said that the surviving victim picked defendant out of a six pack and that they had shell casings from which they would get DNA or fingerprints. They told defendant someone identified him. The detectives did not mention whether the crime occurred during the day or night and what type of gun was used. Defendant maintained he had nothing to do with the crime. When detectives said they had video of the crime, defendant said it would show he wasn't there.

Back in the cell, defendant told the undercover deputies that the detectives were looking at him for a homicide. Defendant "kind of knew what's up too when they said homicide." Defendant dismissed the shell casings as "[i]t ain't shit homie. Fuck their shell casings homie." When describing his conversation with detectives about the car he drove, defendant related that his baby mama drove a white Chevy Malibu but he usually drove his grandmother's silver Honda Accord: "Yeah, that's why she [the detective] asked like 'what kind of car does your baby's mama drive?' And I told her right away what kind of car she drove. You know what I mean? And I said if I'm not in that car I'm usually, I'm probably in my grandma's car. A silver uh, uh, brand new Honda Accord. You know what I mean? Way fuckin', way different you know what I mean?"

This exchange occurred:

"[Deputy Castro]: And the worst part homes? Sorry to say homes, I know you represent your neighborhood. It's the tats on your face.

"[Defendant]: I know.

"[Deputy Castro]: That, that right there.

"[Defendant]: (unintelligible) yeah.

"[Deputy Castro]: That right there.

"[Defendant]: Hey, but when the mamada [the shit] happened right (pause) you know what I'm talking about? You know what I'm talking about?

4

"[Deputy Navarro]: Yeah. Well then how (unintelligible)?

"[Defendant]: Because – I don't even want to say too much it could be recorded right now dog. You know what I mean? I don't know shit dog. They're trying to get me for a murder that, you know what I mean? It wasn't me dog. [¶] It wasn't me at all homie and it's fucked up. Now I'm looking at 187 for some shit I didn't even do dog.

"[Deputy Navarro]: That's fucked up.

"[Defendant]: I just need my alibi where I was at. . . .

"[Deputy Castro]: Unintelligible.

"[Defendant]: Huh?

"[Deputy Castro]: What about up here?

"[Defendant]: Nada. I had my hair like this. Probably a bit shorter.

"[Deputy Castro]: Enough where you could see?

"[Defendant]: In the noche." When defendant said "the mamada happened," he indicated his face was covered.[6]

While putting his head down, closing his eyes, and leaning his head, defendant told the deputies "they were both" "like this." Defendant added, "They both bang too." "I think he was the older too, than the fool that, the one that was driving was the youngster. [¶] . . . [¶] That was the one that got smoked."

Defendant had been back in the holding cell after the first interview for about 40 minutes when he was removed again and told he was being charged with murder, although this was not true. His fingerprints were taken and he was put back into the cell. The detective did this "just to stimulate him to get him thinking, get his head spinning a little bit so when he goes back into the cell, now he knows why he's there and what it's all about."

---

[6] Deputy Castro indicated at trial "with both hands basically made into fists, basically at nose level, both hands together at nose level, and drawing them out towards the upper cheek area, across the upper cheek area."

Later, at defendant's request, he talked to detectives for about 10 minutes. He asked what the date of the crime was so that he could ask his family where he was, although he said he was most likely with his baby mama.

Toward the end of the operation, Deputy Castro was alone in the cell with defendant. Throughout the conversation, defendant would pause and use his hands to describe, for example, how the cars were positioned: "It was one of these. This was them." "They were, you know? And (pause) just fucking (makes sound). Boom. One." The conversation continued:

"[Defendant]: . . . But the only reason why he said it was, because when it first, when the thing –

"[Deputy Castro]: Mm hmm.

"[Defendant]: I was out.

"[Deputy Castro]: Mm hmm.

"[Defendant]: And they ran (unintelligible) dog. (unintelligible) about to take off. I was walking, I was going to my grandma's pad. (unintelligible) and he was driving on the side right there. There was already a car right here. (makes sound) Popped the door open. Stood like this. I just stood right there fool. My homie left me dog, the fool that was on foot with me, ran. Ran into my neighbor's house dog. The reason why I (unintelligible) is 'cause I didn't want them shooting up that pad dog. They got little kids there at that pad. They're my neighbors, you know?

"[Deputy Castro]: Mm hmm.

"[Defendant]: So I just looked at the homie fool. And he seen me fool, and I stood there fool. (makes sound) You know what I mean? Like pretty much (unintelligible) fool. I wasn't, I stood right there fool, like a G, fool. My homie calls me, the one that was (unintelligible) (makes sounds). I was like fuck this fool dog. Told him 'Kings Gang.' I just started walking, could have fucking, easy, you know? . . .

[¶] . . . [¶]

"[Deputy Castro]: So then you guys just fucking got them after that?

"[Defendant]: They followed them (unintelligible).

6

"[Deputy Castro]:  Oh, they followed you?

"[Defendant]:  (unintelligible).

"[Deputy Castro]:  But I thought you guys were in the back?

"[Defendant]:  (unintelligible) the homie calls me, telling me he's dropping me off supposedly.  He was going to drop me off.  We were gonna take off.  We were (unintelligible) stood right there like follow me, like you know when someone's walking and someone's driving on the side of you like (makes sound).  [¶] . . . [¶]  Yeah, and then he stopped because he heard me, he heard that fool, that other fool already parked over there waiting.  That fool got, he could have easily, and then he's just like, I just stood there.  (Unintelligible)  'Where you from?'  The homie's already calling me like 'hey (unintelligible).'

"[Deputy Castro]:  Uh huh.

"[Defendant]:  'Kings gang' (unintelligible)  I just started walking to the (unintelligible) car, jumped in.  That's when that (unintelligible).

"[Deputy Castro]:  (unintelligible)

"[Defendant]:  Then after that they went (unintelligible)

"[Deputy Castro]:  Oh, so you guys went in the front and then you just got out and blasted them?

"[Defendant]:  (unintelligible)

"[Deputy Castro]:  (unintelligible) car (unintelligible) your car was in the front or your car was in the back?

"[Defendant]:  They were chasing us.

"[Deputy Castro]:  Oh they were chasing you guys?

"[Defendant]:  Yeah. . . . ."

This exchange occurred:

"[Deputy Castro]:  (unintelligible) that other car took off after or no?

"[Defendant]:  It was like this.

"[Deputy Castro]:  (unintelligible)

"[Defendant]:  It was like this, it was just this.

7

"[Deputy Castro]: Fuck.

"[Defendant]: And it's, and then the first one I seem him like, I hit. He's like boom.

"[Deputy Castro]: (unintelligible)

"[Defendant]: I was already blast – like this. (makes sound)

"[Deputy Castro]: Uh huh.

"[Defendant]: (unintelligible) fool.

"[Deputy Castro]: Mm hmm.

"[Defendant]: And I just seen them they were just like – just like. The homie was, the other one that was with me there –

"[Deputy Castro]: Mm hmm.

"[Defendant]: I told him 'give me that. Give me that.'

"[Deputy Castro]: Mm hmm.

"[Defendant]: Grab (unintelligible) I (unintelligible)

[¶] . . . [¶]

"[Defendant]: And that fool that was the passenger was the one that could have. The driver wasn't (unintelligible) fuckin'.

"[Deputy Castro]: It was the passenger then (unintelligible)?

"[Defendant]: Yeah he's the one.

"[Deputy Castro]: Oh so (unintelligible).

"[Defendant]: He, he's the one who was trying to, you know?

"[Deputy Castro]: But he (unintelligible) is he the one that (unintelligible)?

"[Defendant]: (unintelligible) banged on me."

Deputy Castro elaborated on defendant's statements: defendant was walking at night when someone from the victim's car threw out a gang sign. Defendant responded with his gang's name, " 'Kings Gang.' " Defendant got into his homie's car and they covered their faces. At one point, the victim's car was behind the car defendant was in. Defendant's car stopped, and defendant got out and started shooting. "Walk up to the motherfucker (unintelligible) (makes sounds) (laughs). It's like they were like this,

8

literally, both of them." Shots came back from the victim's car. Defendant's homie got out of the car and was supposed to shoot, but he chickened out. Defendant said it was "smart the way it went down"—"mouse trap." After the shooting, defendant got into a second car. Defendant got rid of his and his companion's guns. He then "kicked it in the 'hood for a little bit. Came back to the 'hood still running around in G rides. Still fucking with a different one. .357 mag baby boy."[7]

From time to time, defendant denied involvement in the homicide: "Yeah fool, but I didn't do shit dog. They're trying to say it was me dog, you know."

Deputy Castro also told defendant he should start thinking about a deal, a "number" he would take. The deputy told defendant about a guy who went to trial and got a long sentence. Defendant said he would take anything without the "L"—life.

C.     *Gang evidence.*[8]

Detective Jeffrey Honeycutt, the People's gang expert, knows defendant, a KHA member, from prior contacts and from talking to other officers about him. Based on a hypothetical modeled on the facts of this case, the detective opined that such a crime was committed for the benefit of KHA.

D.     *Defense evidence.*

Martinez told Officer Jose Castro that he was a North Side Bolen Parque gang member and, on the night Reyes was killed, they were on a "mission" looking for rival gang members, either East Side Bolen Parque or KHA. They were in a stolen car and the gun Martinez used was his.

At the time Reyes was shot, defendant was at Michelle Fernandez's house.

---

**7**     Defendant told the deputies about another, unrelated, incident he was involved in during which he "hopped out of my car with a .357 mag, fool and tapped on the window . . . ."

**8**     We discuss additional gang evidence in Discussion Section IV.

## II. Procedural background.

On February 21, 2014, a jury found defendant guilty of count 1, the first degree murder of Reyes (Pen. Code, § 187, subd. (a))[9] and count 2, the willful, deliberate and premeditated attempted murder of Martinez (§§ 187, subd. (a), 664). As to both counts, the jury found true gang (§ 186.22, subd. (b)(1)(C)) and personal gun use (§ 12022.53, subds. (b), (c), (d)) allegations.

On March 25, 2014, the trial court sentenced defendant, on count 1, to 25 years to life plus a consecutive 25 years to life for the gun use. On count 2, the court sentenced him to life with a 15-year minimum parole eligibility period (§ 186.22, subd. (b)(5)) plus 25 years to life for the gun use. The court imposed but stayed sentences on the remaining gun enhancements.

## DISCUSSION

## I. Sufficiency of the evidence.

Defendant contends: A. his jailhouse statements constituted insufficient evidence he committed the crimes, and B. there was insufficient evidence he premeditated and deliberated. We reject both contentions.

A. *There was sufficient evidence to support the judgment.*

In assessing the sufficiency of the evidence to support a conviction, "we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the

---

[9] All statutory references are to the Penal Code.

10

exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357; see also *Jackson v. Virginia* (1979) 443 U.S. 307; *People v. Snow* (2003) 30 Cal.4th 43, 66.)

Where a defendant knows details of the crime that only the perpetrator would know, this may constitute sufficient evidence to support a conviction. (See, e.g., *People v. Maury* (2003) 30 Cal.4th 342, 401 [defendant provided details about victim (the location of the body and that the victim was strangled with a scarf) that only the killer would know], overruled on other grounds by *Barnett v. Superior Court* (2010) 50 Cal.4th 890, 901; *People v. Lewis* (2009) 46 Cal.4th 1255, 1291 [defendant denied raping murder victim *before* being accused of raping her].)

Here, defendant discounts the evidence as "so vague and so common to any crime of this nature as to have no solid probative value." Defendant, however, provided details about Reyes's murder that coincided with the surviving victim's (Martinez) testimony and with other evidence:

- Martinez and Reyes were shot at while in a car: defendant said that the victims were in a car when he shot them.
- Martinez shot back at his assailants: defendant said that the victims returned fire. "One. One. That's all they got off. All they got is one."[10]
- Martinez couldn't describe anyone because they wore "rags" over their faces: defendant indicated that he wore a mask.

---

**10** Martinez fired more than once, because there were three exit bullet strikes in the Honda's windshield.

11

- Reyes, the driver, was killed, but Martinez, the passenger, survived: defendant knew that the driver was the one who was "smoked."

- The shooting happened at 10:40 p.m.: although defendant was not told the shooting occurred at night, he knew it happened at night or the "noche."

- Reyes was 20 and Martinez was approximately a year and a half older: defendant described the driver as younger than the passenger.

- Martinez described the shooter's car as a "white SUV." Defendant made statements to mislead detectives about the car he drove. He told detectives he usually drove a white Chevy Malibu or a silver Honda Accord. When repeating this to the undercover deputies, defendant said, "way different you know what I mean?" A reasonable interpretation of this statement is that a Malibu and an Accord are "way different" than the SUV used in the shooting.

- The bullet recovered from Reyes's body was fired from either a .38 special or a .357 magnum. After the shooting, defendant "Came back to the 'hood still running around in G rides. *Still fucking with a different one. .357 mag baby boy*." (Italics added.) This statement raises a reasonable inference that defendant got rid of the .357 he used to shoot Reyes and got a "different" .357.

Possible discrepancies between defendant's and Martinez's stories do not render the evidence insufficient to support the conviction. Martinez, for example, indicated that this was a car-to-car shooting; but defendant said he got out of his car to shoot at the victims. Martinez didn't mention to the detectives that he issued a gang challenge; but defendant said that the victims initiated the encounter. Defendant said that the victims shot once; but ballistics evidence established that Martinez fired at least three shots. Legitimate explanations exist for any differences in testimony. Martinez, for example, may not have told detectives about his gang challenge to minimize his role in the incident.

12

In any event, defendant's argument amounts to a request we reassess Martinez's credibility and resolve or reweigh conflicts in the evidence in defendant's favor. But " 'it is not a proper appellate function to reassess the credibility of the witnesses.' [Citation.]" (*People v. Friend* (2009) 47 Cal.4th 1, 41; see also *People v. Cortes* (1999) 71 Cal.App.4th 62, 81 [where an appellant "merely reargues the evidence in a way more appropriate for trial than for appeal," we are bound by the trier of fact's determination].) We resolve neither credibility issues nor evidentiary conflicts. (*People v. Maury, supra,* 30 Cal.4th at p. 403; *People v. Mejia* (2007) 155 Cal.App.4th 86, 98.) That the evidence is reconcilable with a contrary finding does not warrant a reversal. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1170.)

B.    *There was sufficient evidence that the murder and attempted murder were premeditated, deliberate and willful.*

Defendant next contends that there was insufficient evidence of premeditation and deliberation. We disagree.

Premeditation and deliberation requires more than a showing of intent to kill. (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419; *People v. Concha* (2010) 182 Cal.App.4th 1072, 1083-1084.) An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection, rather than as the product of an unconsidered or rash impulse. (*People v. Burney* (2009) 47 Cal.4th 203, 235; *People v. Jurado* (2006) 38 Cal.4th 72, 118.) "The process of premeditation and deliberation does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . .' [Citations.]" (*People v. Mayfield* (1997) 14 Cal.4th 668, 767, overruled on other grounds by *People v. Scott* (2015) 61 Cal.4th 363, 390, fn. 2; see also *People v. Solomon* (2010) 49 Cal.4th 792, 813.)

We normally consider three types of evidence when determining whether a premeditation and deliberation finding is adequately supported: planning activity; motive; and the manner of killing. (*People v. Gonzalez* (2012) 54 Cal.4th 643, 663-664;

13

*People v. Burney, supra*, 47 Cal.4th at p. 235; *People v. Romero* (2008) 44 Cal.4th 386, 401; *People v. Anderson* (1968) 70 Cal.2d 15, 26-27; *People v. Boatman* (2013) 221 Cal.App.4th 1253, 1266.)  Such a finding will be sustained where there is evidence of all three types, or extremely strong evidence of planning, or evidence of motive in conjunction with either planning or manner of killing.  (*Romero,* at p. 401; *Boatman,* at p. 1266.)

There was evidence of all three *Anderson* factors.  Regardless of who initiated the encounter (either defendant or Martinez by issuing a gang challenge to defendant), there was evidence of planning.[11]  Defendant was in one car, but he left the scene in a second, "get away" car.  Defendant wore a "rag" to obscure his face.  Defendant also had a gun. (See *People v. Lee* (2011) 51 Cal.4th 620, 636 [the defendant's possession of a loaded gun on the night of the murder indicates he "considered the possibility of a violent encounter"].)  Defendant's use of two cars and a mask, coupled with possession of a gun, shows planning activity.

There was evidence of motive.  Reyes and Martinez were North Side Bolen Parque gang members.  Defendant belonged to a rival gang, KHA.  Defendant was either responding to Martinez's gang challenge or looking for rivals.  (See *People v. Sanchez* (2001) 26 Cal.4th 834, 849 ["Premeditation can be established in the context of a gang shooting even though the time between the sighting of the victim and the actual shooting is very brief"]; *People v. Rand* (1995) 37 Cal.App.4th 999, 1001 ["A studied hatred and enmity, including a preplanned, purposeful resolve to shoot anyone in a certain neighborhood wearing a certain color, evidences the most cold-blooded, most calculated, most culpable, kind of premeditation and deliberation"].)

The manner of killing also showed premeditation.  According to defendant, the victim's car, at one point, was behind him.  Defendant's car stopped, and defendant

---

**11**     According to Martinez, he was "cheap shotted" from behind.  According to defendant, after the victims issued a gang challenge, he got into his homie's car and, when the victims' car was behind his, defendant's car stopped and he got out and shot at the victims.

14

*got out* of the car and shot at the victims. Defendant used the phrase "mouse trap" to describe how the crime and/or his escape in a getaway car occurred. If the jury believed Martinez's version of events—that they were "cheap shotted" from behind, this also shows premeditation; i.e., defendant came up from behind his victims and shot at them.

**II.     The admissibility of defendant's jailhouse statements to undercover deputies.**

Defendant contends that his statements were involuntary and obtained in violation of his rights under the Fifth and Fourteenth Amendments. We disagree.

A.     *Additional background.*

Before trial, defendant moved to exclude his jailhouse statements, on the ground they were obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). Similar to his later testimony at trial, Detective Ferguson testified at the motion hearing that, after receiving tips defendant was responsible for the shooting, the detective set up an undercover operation in an effort to "stimulate" defendant and get him to talk. Defendant was placed in a cell with two undercover deputies posing as inmates. Defendant was not *Mirandized* before the operation. Defendant was removed from the cell at one point for a 20-minute interview with detectives, whose job it was "to get [defendant's] head spinning a little bit so he'd go back and talk to people who he may believe are in a similar situation as he. And they're mainly to be a sounding body. And if he says something incriminating, to get him to continue to speak." The detectives told defendant that the surviving victim picked him out of a six pack based on defendant's tattoo and that a surveillance camera captured images of the shooter's car. Defendant was placed back in the cell, but he asked to speak to detectives again. Defendant was in the cell about "3, 4 hours." The undercover deputies talked to defendant about going to trial, in which case "all bets are off."

Based on this, defendant argued that the operation was a custodial interrogation requiring *Miranda* rights to be given. He distinguished *Illinois v. Perkins* (1990) 496 U.S. 292, 296 (*Perkins*), which found that "[c]onversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*." Defendant argued that the undercover operation here "goes far beyond what the undercover officer did" in

*Perkins*, in terms of length of time and the sophisticated questioning. The trial court, however, found the statements admissible under *Perkins.*

        B.      *The undercover operation did not violate defendant's due process rights.*

Although defendant argued below that his statements were inadmissible because he was not *Mirandized*, his contention on appeal appears limited to a due process claim based on the alleged involuntariness of his statements.[12]

An involuntary confession—one that is not free because the defendant's will was overborne—is inadmissible at trial under the due process guarantees of the United States and California Constitutions. (*Mincey v. Arizona* (1978) 437 U.S. 385, 398 [a confession is involuntary if it is not the product of a "rational intellect" and "free will"]; *People v. Boyette* (2002) 29 Cal.4th 381, 411; *People v. Massie* (1998) 19 Cal.4th 550, 576.) " ' "A confession may be found involuntary if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence. [Citation.] Although coercive police activity is a necessary predicate to establish an involuntary confession, it 'does not itself compel a finding that a resulting confession is involuntary.' [Citation.] The statement and the inducement must be causally linked. [Citation.]" [Citation].' [Citation.]" (*People v. Linton* (2013) 56 Cal.4th 1146, 1176; see also *Colorado v. Connelly* (1986) 479 U.S. 157, 164, fn. 2, 167.) In assessing allegedly coercive police tactics, "courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable." (*People v. Ray* (1996) 13 Cal.4th 313, 340.) Whether a statement is voluntary depends on the totality of the circumstances surrounding the interrogation. (*People v. Boyette, supra,* 29 Cal.4th at p. 411.) A totality of the circumstances review requires evaluating all the circumstances surrounding the

---

[12]     Because defendant did not expressly raise a due process claim below, the People contend the issue is forfeited. (See generally *People v. Tully* (2012) 54 Cal.4th 952, 992.) To the extent defendant's substantial rights (§ 1259) are implicated, we may address the merits. (See *People v. Wallace* (2008) 44 Cal.4th 1032, 1074, fn. 7; *People v. Felix* (2008) 160 Cal.App.4th 849, 857-858.)

interrogation, including the element of police coercion, the length of the interrogation, its location and continuity, and defendant's maturity, education, and physical and mental condition. (*Ibid.*)

That defendant gave statements to people he thought were friends but in fact were undercover deputies does not render the operation coercive. In *People v. Atchley* (1959) 53 Cal.2d 160, 168, for example, the police secretly recorded a conversation between the defendant and his insurance broker, who was a former police officer and who had agreed to question defendant. *Atchley* rejected the contention that "the recording was obtained by such fraud that its use as evidence was inconsistent with due process." (*Id.* at p. 171.) The deception was not of a type reasonably likely to produce an untrue statement. (*Ibid.*; see also *People v. Jenkins* (2004) 122 Cal.App.4th 1160, 1173 ["there was nothing improper or coercive about placing defendant and Marbley alone together in the holding cell and secretly tape-recording their conversation. Defendant was unaware that Marbley was taping their conversation; from his perspective he was talking to a friend"]; see *People v. Bradford* (1997) 14 Cal.4th 1005, 1043 [detective's attempt to establish a "rapport" with suspect is not necessarily coercive].)

Although *Perkins* was decided under *Miranda* and did not directly address the voluntariness of statements made during an undercover operation,[13] it does suggest that an undercover jailhouse operation is not per se coercive. (See *Perkins, supra,* 496 U.S. at p. 296 ["[w]hen a suspect considers himself in the company of cellmates and not officers, the coercive atmosphere is lacking"]; accord, *People v. Jefferson* (2008) 158 Cal.App.4th 830, 840-841 [defendant's conversation with cellmate was not an interrogation; *Miranda* warnings not required].) Like the defendant in *Perkins,* defendant here thought that Deputies Castro and Navarro were fellow inmates and South Side gang members. From

---

**13**     Justice Brennan, however, suggested that the "deception and manipulation practiced on respondent raise a substantial claim that the confession was obtained in violation of the Due Process Clause." (*Perkins, supra,* 496 U.S. at p. 301 (conc. opn. of Brennan, J.).)

17

defendant's perspective, he was talking to friends. There was nothing "coercive" about the atmosphere.

Nor did other circumstances surrounding the undercover operation render the situation coercive. Defendant was removed from the cell for one 18-minute interview with detectives and he later *requested* an interview with detectives. There is nothing unusual in this: suspects are often removed from holding cells for interviews. Defendant makes no claim that the detectives threatened him during those interviews.

He does, however, assert that the detectives lied to him. But the use of deceptive comments does not necessarily render a defendant's statements involuntary. (*People v. Farnam* (2002) 28 Cal.4th 107, 182.) Where the deception is not of a type reasonably likely to procure an untrue statement, a finding of voluntariness is warranted. (*Ibid.*) Here, the detectives untruthfully told defendant that they had shell casings from which they could get DNA or fingerprints, video surveillance of the crime, and a witness who identified defendant. They pretended to charge defendant with murder. These lies were not of the type likely to produce an unreliable statement. (See, e.g., *ibid.* [false representation that the defendant's fingerprint was on the victim's wallet did not render a confession involuntary]; *People v. Thompson* (1990) 50 Cal.3d 134, 166-167 [interrogating officers falsely told the defendant that his car had been connected to the scene of the crime and that other physical evidence linked defendant to the crime], disapproved on other grounds as stated in *Creutz v. Superior Court* (1996) 49 Cal.App.4th 822, 829; see *People v. Guerra* (2006) 37 Cal.4th 1067, 1096-1097 [detective's false statement there was sufficient probable cause to arrest defendant was not likely to produce a false statement], overruled on other grounds by *People v. Rundle* (2008) 43 Cal.4th 76, 151.) It also appears that the detective's lies in fact had little effect, because defendant told the undercover deputies that the "shell casings" "ain't shit." When told about the video surveillance, defendant maintained he wasn't there.

18

Defendant also highlights Deputy Castro's statement that defendant should think about a deal and that a guy who went to trial got a long sentence.[14] This was not a threat or a promise, for example, that defendant should confess or he would get a long sentence. (Compare with *People v. Neal* (2003) 31 Cal.4th 63, 81 [detective's threats and promises undermined voluntariness of the defendant's statements].) At most, it was a permissible discussion about an advantage or other consequence that might naturally accrue from speaking truthfully about the crime. (See *People v. Ray, supra,* 13 Cal.4th at p. 340.)

*In re Elias V.* (2015) 237 Cal.App.4th 568 is distinguishable. There, 13-year-old Elias was at school when the principal brought him to a small room to be "aggressive[ly]" and "persist[ently]" interrogated by two officers, while a third waited outside. (*Id.* at pp. 574, 583.) The *Elias* court's finding that the minor's statements were involuntary was premised largely on his youth, which rendered him particularly susceptible to false evidence and deceptive interrogation techniques. At 21 years of age, defendant here was young, but he was not a juvenile. And defendant did not know he was talking to undercover deputies, in contrast to Elias, whose interrogator was not undercover.

The totality of the circumstances show that defendant's statements were voluntary.

### III. Ineffective assistance of counsel.

Defendant contends that his trial court provided ineffective assistance by failing to object to evidence about how defendant came to be a suspect; his other crimes; and to "profile evidence."

#### A. *Standard of review.*

"To establish ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have

---

[14] This testimony was not considered by the trial court at the hearing on defendant's motion to exclude the statements.

been more favorable to the defendant.  [Citation.]  'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'  [Citation.]"  (*People v. Scott* (1997) 15 Cal.4th 1188, 1211-1212; see also *Strickland v. Washington* (1984) 466 U.S. 668, 694; *People v. Homick* (2012) 55 Cal.4th 816, 893, fn. 44.)  If the defendant makes an insufficient showing on either component, the claim fails.  (*Homick*, at p. 893, fn. 44.)  We defer to " ' "counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " [Citation.]' "  (*People v. Hinton* (2006) 37 Cal.4th 839, 876; see also *People v. Carter* (2003) 30 Cal.4th 1166, 1211.)

B.      *The failure to object to evidence of anonymous phone calls.*

Evidence explaining why defendant was selected for the undercover operation was introduced without objection.  Specifically, on direct examination, the prosecutor asked Detective Ferguson:  "Now, eventually, during your investigation, [defendant] becomes a suspect as the shooter in your investigation; is that correct?"  The detective answered, "His name came up.  I wouldn't officially call him a suspect."  "At this point his name came up as on the street type of thing that we might want to talk to him."

Defense counsel cross-examined the detective about how defendant became a suspect:

"Q.    . . . And so in this particular interview that you had – now we're switching to [defendant] – you brought him into that operation or into this interview setting as a result of you indicated he wasn't a suspect, but that he was a person of interest, I guess you could call it, right?

"A.    I don't use the term person of interest personally.  [¶ ]. . . [¶]  He was not officially a suspect.  We just heard some anonymous information that he was a gang member on the street that we might want to look at.

"Q.    Okay.  So [defendant] became a subject or a person of interest or however you want to call it, or somebody that you should look at, as a result of receiving anonymous information, correct?

20

"A.     Correct.

"Q.     Somebody called up, didn't leave a name or anything like that, and said, hey, you ought to look at [defendant], right?

"A.     We had a few of those calls.  Right.

"Q.     Something like that, right?

"A.     Yes.

"Q.     When you set this operation up, as you called it, you didn't have any information connecting [defendant] to this homicide, did you?

"A.     We had no physical evidence or witnesses.  No.

"Q.     No.  Okay.  So it was basically you got this anonymous call and then you said let's start this operation, see what happens, right?

"A.     Correct."

On redirect, the detective clarified that three anonymous calls instigated the jailhouse operation.

We need not decide whether this testimony was objectionable as, for example, hearsay (Evid. Code, § 1200) or on relevancy grounds (Evid. Code, § 350).  Even it was, we easily discern a tactical reason why defense counsel did not object to it.  Given that no witness or physical evidence linked defendant to the crimes, his statements to the undercover deputies constituted the crux of the case.  Defense counsel therefore had a difficult choice:  either to allow evidence about how defendant came to law enforcement's attention or try to exclude such evidence and risk speculation about why police subjected defendant to the undercover operation.

Counsel strategically used the anonymous caller evidence to buttress defendant's innocence.  Defense counsel thus argued that defendant was "set up."  An anonymous caller spread "gossip" about defendant, and, based on "innuendo," the detectives subjected defendant to a sophisticated undercover operation to get him to admit to a crime he didn't commit.  Counsel therefore argued in closing, "Why is [defendant] in this courtroom? . . .  [¶]  You heard from the detective they didn't have any evidence against him, they couldn't charge him with anything.  He's here for one of the worst reasons that

21

a person – that can happen to him. He's here as a result of gossip, of rumor, of rank innuendo. . . . [¶] It's because somebody called up the police station and said you should look at [defendant]. An anonymous phone call to the police station. And the detective said there may have been several. [¶] We don't know if it's all the same person or other people. We don't know anything about that. We cannot test the credibility of what started this whole thing, why [defendant] is here, . . . [¶] . . . [¶] And as a matter of fact, the evidence that – the phone call, the police, the detective wouldn't even say that that le[]d to [defendant] being a suspect. [¶] You know, I used the term that you kind of hear all the time on the news. Well, if you're not a suspect, then you're something called a person of interest, you know. We hear that on the news, you know. Well, the police are talking to somebody who is not a – they don't consider him a suspect, but consider him a person of interest. Okay? [¶] And the detective said well, I don't even like that term. He says, we didn't even consider him a person of interest. We just wanted to look at him. . . . [¶] So one thing you can take away from this is that you never want to be a person of interest or somebody that the police look at. Because after hearing the testimony in this case, which should outrage you as citizens, you can see what can happen to an innocent person."

Because defense counsel decided to highlight how defendant came to be the subject of the undercover operation, his decision not to object to evidence and not to request a limiting instruction was tactical. (See *People v. Riccardi* (2012) 54 Cal.4th 758, 825 ["there may be situations in which the decision to seek a limiting instruction is best left to defense counsel's discretion in order to evaluate whether the risk of such an instruction highlighting the defendant's conduct outweighs any benefit the instruction may provide"]; *People v. Thomas* (2012) 53 Cal.4th 771, 810.)

C. *Evidence of defendant's other crimes.*

Evidence that a defendant committed misconduct other than that currently charged is generally inadmissible to prove he or she had a propensity to commit the charged crime. (Evid. Code, § 1101, subd. (a); *People v. Kelly* (2007) 42 Cal.4th 763, 782; *People v. Rogers* (2009) 46 Cal.4th 1136, 1165.) Here, Detective Ferguson, without

objection from defense counsel, testified that he conducted the undercover operation because defendant had "been arrested for a very similar, not murder, but stolen car, running from the cops, pursuit with a gun, all things pretty much involved in our case except for the pursuit part."

Assuming that this evidence was objectionable, reasons for not objecting are readily apparent. That the operation was conducted in jail by undercover deputies posing as gang members was an inescapable fact in evidence. Defense counsel therefore again had a difficult decision: either allow the jury to hear why defendant was in custody or let the jury speculate about what he had done to land in jail. Counsel decided that the lesser of the two evils was to admit unsanitized evidence defendant was in custody for having a stolen car and a gun, rather than let the jury speculate it was for a more serious crime. Indeed, defense counsel first elicited this fact. He asked Deputy Castro whether defendant said he was "in [jail] for a G-ride and having a strap [gun], right?"

That the failure to object to other crimes evidence was a strategic decision is further demonstrated by defense counsel's use of the evidence to cast doubt on defendant's admissions. Counsel argued that defendant confessed because "hey, I'm gonna give these guys something. . . . Or you know what, maybe he's bragging to these guys in there. These guys [the undercover deputies] are in there for murder. That's what they told him, they're in there for murder. And here's little old [defendant]. He's in there for a G ride. And so, you know, maybe he's saying hey, I got to say something that makes these guys think I'm bad."

Counsel therefore used other crimes to explain why defendant admitted to the shooting. (See, e.g., *People v. Hinton, supra,* 37 Cal.4th at p. 877.)

D.     *Profile evidence.*

Next, defendant contends that his trial counsel was ineffective because counsel failed to object to "profile evidence." "A profile is a collection of conduct and characteristics commonly displayed by those who commit a certain crime. One court has described profile evidence as 'a listing of characteristics that in the opinion of law enforcement officers are typical of a person engaged in a specific illegal activity.'

23

[Citation.]" (*People v. Robbie* (2001) 92 Cal.App.4th 1075, 1084; see also *People v. Jackson* (2013) 221 Cal.App.4th 1222, 1237-1238.) Such evidence is usually inadmissible to prove guilt. (*Robbie,* at p. 1084.)

Defendant argues that the following testimony from Detective Ferguson was objectionable "profile evidence":

"Q.    And have you conducted many of these operations?

"A.    Several. Yes.

"Q.    Sometimes people implicate themselves. Would that be fair to say?

"A.    Yes.

"Q.    Sometimes people maintain that they had nothing to do with it, right?

"A.    Well, I've been fortunate so far.

"Q.    Okay. But sometimes people indicate that there's maybe other parties involved as well?

"A.    In every one I've done, at some point they always will look around the cell and they can lay it out A to Z, then in the middle they say but I wasn't there, but it wasn't me. It's very, very common for that statement to be made.

"Q.    Despite having implicated themselves in certain statements?

"A.    In spite of laying out things only the shooter or a suspect would know, they will oftentimes, almost on every one I've done, they will say oh, well, but I didn't do it. It wasn't me."

This was not "profile evidence." The detective wasn't explaining characteristics of people who commit a particular crime, for example, drug couriers. (See, e.g., *People v. Robbie, supra,* 92 Cal.App.4th at p. 1084.) Instead, the detective was suggesting that people during undercover operations will say they "didn't do it," even though they "lay out" details of the crime from "A to Z." In other words, he called into question defendant's denials he committed the crime. To this extent, the evidence was objectionable. The detective's opinion about defendant's veracity or guilt or innocence was irrelevant. (*People v. Torres* (1995) 33 Cal.App.4th 37, 46-47.) Nonetheless, any

failure to object did not prejudice defendant. The comments were isolated, and the questions and answers were posed as generalities rather than specifically to defendant.

## IV. The gang enhancement.

Defendant makes two contentions concerning the gang enhancement. First there was insufficient evidence of KHA's primary activities. Second, the trial court failed to instruct the jury properly on primary activities.

### A. *There was sufficient evidence of KHA's primary activities.*[15]

A " 'criminal street gang' " is any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more statutorily enumerated offenses, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity. (§ 186.22, subd. (f); see also *People v. Sengpadychith* (2001) 26 Cal.4th 316, 319-320, 323.) To establish the group's primary activities, the trier of fact may consider past offenses as well as the present, charged offenses. (*Sengpadychith*, at p. 323.) The offenses must be one of the group's "chief" or "principal" occupations, which necessarily excludes "the occasional commission of those crimes by the group's members." (*Ibid*.; see also *In re Alexander L.* (2007) 149 Cal.App.4th 605, 611 [isolated criminal conduct is not enough]; *People v. Perez* (2004) 118 Cal.App.4th 151, 160 [retaliatory shootings of a few individuals over a period of less than a week plus a beating six years earlier was insufficient to establish the requisite criminal activity].)

Sufficient proof of the gang's primary activities "might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute." (*People v. Sengpadychith*, *supra,* 26 Cal.4th at p. 324; *People v. Vy, supra*, 122 Cal.App.4th at pp. 1224-1225 [evidence that the gang committed three predicate crimes over a short time period, including the charged crime, satisfied the primary activities prong of section 186.22, subdivision (f)].) A gang expert's testimony

---

[15] We review the sufficiency of the evidence to support a true finding on an enhancement under the same standard we stated above in Discussion, Section I. (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1224.)

may also provide evidence of a gang's primary activities. (*Sengpadychith*, at p. 324; *People v. Gardeley* (1996) 14 Cal.4th 605.)

Here, the People's gang expert, Detective Jeffrey Honeycutt, spent his entire career (over 11 years) in Baldwin Park, and he was familiar with the gangs operating there. During that time he "made several hundred contacts with gang members, gang associates and their affiliates, family members, in both custodial and noncustodial environments. I've interviewed gang members, gang associates on their culture, their gang culture, their territories, their crimes they commit." He described KHA's evolution from a tagging crew into "more of a street gang type organization" by "committing more violent crimes." The detective also testified about two KHA gang members who were convicted of attempted murder with gang and gun enhancements.

As to KHA's primary activities, the detective testified:

"Q.    . . . What are the primary activities of the KHA gang?

"A.    It could be anything from, like I said, vandalism, marking up their territory or disrespecting and marking up a rival gang's territory, anything from vandalism all the way up to murder.

"Q.    And what are some of their other primary activities when they act in the capacity of a gang? What kinds of crimes are they doing?

"A.    Drug sales, shootings, vehicle theft.

"Q.    You say shootings. Are you talking about like discharging a firearm up in the air?

"A.    No. Shootings of rival gang members or thought to be rival gang members.

"Q.    Murders or attempted murders?

"A.    Yes."

Defendant argues that the detective, by using the phrase " 'could be,' " suggested mere "possibilities," not facts. We reject this restrictive interpretation of the detective's testimony. The entirety of the exchange is about KHA's primary activities. We see no ambiguity that would render the testimony insubstantial. (See, e.g., *People v. Margarejo*

(2008) 162 Cal.App.4th 102, 107 [jury could infer that expert's reference to the gang's "activities" was to its "primary activities"].)

Defendant next dismisses as "conclusory" Detective Honeycutt's testimony and likens it to the expert's testimony in *In re Alexander L., supra*, 149 Cal.App.4th 605. In *Alexander L.*, the expert said he knew that the gang had committed predicate crimes, but "[n]o specifics were elicited as to the circumstances of these crimes, or where, when, or how [the expert] had obtained the information. He did not directly testify that criminal activities constituted [the gang's] primary activities. Indeed, on cross-examination, [he] testified that the vast majority of cases connected to [the gang] that he had run across were graffiti related." (*Id.* at pp. 611-612, fn. omitted.)

This case is not like *Alexander L.* Detective Honeycutt had years of experience, not just with gangs in general but with Baldwin Park gangs specifically. He testified at length about KHA's history, its territory, its membership, and tattoos and symbols associated with the gang. The detective knew defendant from prior contacts. In addition to the above testimony about KHA's primary activities, the detective personally participated in the investigation of an attempted murder committed by Thomas Xulu, a KHA member, which resulted in Xulu's conviction in 2013 for that crime. The detective also knew about the 2010 conviction of Rigoberto Mejia, another KHA gang member, for attempted murder. We therefore reject the notion that Detective Honeycutt's testimony was conclusory.

B.     *Instructional error.*

Defendant next contends that the gang instruction (CALJIC No. 17.24.2), first, erroneously listed assault as a primary activity, and, second, failed otherwise to define the elements of each offense constituting a primary activity.[16]

---

[16]     Defendant did not object to the instruction. Having failed to do so, he may have forfeited the claim on appeal. Because defendant argues that the instruction included an inapplicable primary activity and the exclusion of the elements of those activities rendered the instruction legally incorrect, we address the merits of the claims.

27

First, the *written* jury instructions listed "assaults, 245 shootings, [and] drug sales" as KHA's primary activities. But "assault" is not an enumerated offense constituting a "primary activity." (§ 186.22, subd. (e)(1)-(25) & (e)(31)-(33).) The erroneous inclusion of assault was harmless error. The jury was *orally* instructed that KHA's primary activities were "assaults, 245, assault with a deadly weapon, shootings, drug sales, murder."[17] Assaults with a deadly weapon, drug sales, and murder are enumerated offenses. (§ 186.22, subd. (e)(1), (3) & (4).) When Detective Honeycutt testified that "shootings" are a primary activity, he explained that he meant "shootings of rival gang members or thought to be rival gang members." The jury therefore would have understood that assaults, like "shootings," referred to assaults with a deadly weapon. In any event, there was sufficient evidence of KHA's primary activities, and any erroneous reference to "assault" was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.)

Second, we doubt that the trial court had a duty to instruct on the underlying elements of, for example, assault with a deadly weapon, and defendant cites no case so holding. (But see CALCRIM No. 1401 [Bench Notes: "The court should also give the appropriate instructions defining the elements of crimes inserted in the list of alleged 'primary activities,' or the definition of 'pattern of criminal gang activity' that have not been established by prior convictions or sustained juvenile petitions"].) In any event, while some of the crimes identified as KHA's primary activities are not enumerated offenses, there was undisputed evidence that two KHA members (Xulu and Mejia) had been convicted of attempted murder with gun and gang use allegations found true. Given

---

**17** Generally, to the extent a discrepancy exists between written and oral versions of jury instructions, the written instructions control. (*People v. Osband* (1996) 13 Cal.4th 622, 717; see *People v. Crittenden* (1994) 9 Cal.4th 83, 138.) But when reviewing a claim of jury misinstruction, we assess the instructions as a whole, viewing the challenged instruction in context with other instructions, in order to determine if there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner. (*People v. Jablonski* (2006) 37 Cal.4th 774, 831.) Here, it is not only possible but likely the jury followed the oral instruction, given that the subject of the case was murder and attempted murder with gun use.

that those convictions, as well as the charged offenses against defendant, are offenses enumerated in section 186.22, subdivision (e), there is no reasonable probability the jury would have resolved the primary activities element of the gang allegation in defendant's favor.

## DISPOSITION

The judgment is affirmed.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



ALDRICH, J.



We concur:



KITCHING, Acting P. J.



JONES, J.*

---

*       Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.